UNITED STATES DISTRICT COURT       <u>ONLINE PUBLICATION ONLY</u>
EASTERN DISTRICT OF NEW YORK

---

BANCO MULTIPLE SANTA CRUZ, S.A.
d/b/a BANCO SANTA CRUZ,[*]

                         Plaintiff,

          - versus -

MIGUEL D. MORENO and LUCY I.
MORENO,

                      Defendants.

MEMORANDUM
<u>AND ORDER</u>

08-CV-1271 (JG) (ALC)

---

MIGUEL D. MORENO,

             Third-Party Plaintiff,

          - versus -

METLIFE INSURANCE COMPANY OF
CONNECTICUT, WINSTON CHUNG and
CITIGROUP, INC.,

             Third-Party Defendants.

---

A P P E A R A N C E S :

        LAW OFFICES OF HERIBERTO A. CABRERA
             5615 Fifth Avenue
             Brooklyn, NY 11220
        By:    Joseph M. Dash
             *Attorney for Third-Party Plaintiff Miguel D. Moreno*

        SCHOEMAN, UPDIKE & KAUFMAN, LLP
             60 East 42nd Street
             New York, NY 10165
        By:    Beth L. Kaufman
             *Attorney for Third-Party Defendant MetLife Insurance Company of Connecticut*

---

[*]     The Clerk of Court is respectfully directed to amend the case caption to conform the spelling of the plaintiff's name to the above spelling.

JOHN GLEESON, United States District Judge:

Miguel Moreno ("Miguel") alleges that his ex-wife, Lucy Moreno ("Lucy"),

forged his signature on withdrawal slips which she then used to withdraw money from their joint

variable annuity account without his knowledge or authorization.  In his third-party complaint,

Miguel has sued MetLife Insurance Company of Connecticut ("MetLife"), the issuer of the

annuity, for negligence in honoring these forged withdrawal slips.  MetLife now brings this

motion for summary judgment, arguing that Miguel has failed to submit any evidence that

MetLife is liable for negligence and that MetLife is entitled to judgment as a matter of law.  For

the reasons explained below, the motion is denied.

BACKGROUND

A.      *The Facts*

On August 8, 2003, Miguel and Lucy, then husband and wife, purchased a

variable annuity contract,[1] Contract Number 936572-0363459 (the "Account"), from Travelers

---

[1]      "An annuity is a contract between a seller (usually an insurance company) and a buyer (usually an individual, also referred to as the 'annuitant') whereby the annuitant purchases the right to receive a stream of periodic payments to be paid either for a fixed term or for the life of the purchaser or other designated beneficiary." *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 104 (2d Cir. 2001).  Variable annuities differ from traditional or "fixed" annuities, in that, after an annuitant purchases a variable annuity, the seller

> will then invest this principal in various securities, usually mutual funds or other investments. . . .  During the accumulation phase of the annuity – from the time the policy is purchased to the time it begins to pay out – the value of the annuity will rise or fall depending on the performance of the underlying securities in which the annuitant's principal is invested.  After a defined number of years the policy will reach its maturity date and begin to pay benefits to the annuitant, known as the "payout" phase.  The annuitant is not guaranteed a certain level of benefits under the policy[;] instead, the payment amount will vary depending upon the value of the portfolio upon maturity and the annuitant's life expectancy.

*Id.* at 104-05; *see also* N.Y. Comp. Codes R. & Regs. tit. 11, § 50.1 ("Variable annuity contract means a separate account annuity contract which includes provision for deferred or immediate annuity payments the amount of which, after such payments have commenced, varies according to the investment experience of any separate account maintained by the insurer as to such contract . . . .").

Life & Annuity Co., for an initial purchase payment of $700,000.[2]  *See* MetLife Contract

(Kaufman Dec., Ex. L, ECF No. 56) at ML0016.  The contract listed Miguel as the certificate

owner and Lucy as the joint owner, with Lucy as the primary beneficiary.  *Id.* at ML0016,

ML0058.  The Data Collection Form completed by Miguel and Lucy on August 4, 2003, in

conjunction with purchasing the Account, listed their shared address as 1302 Redfern Ave., Far

Rockaway, NY 11691.  *See* Data Collection Form (ECF No. 70) at ML0001.

　　　　The contract agreement for the Account specifically provided that for all jointly-

owned accounts, aside from transfers between sub-accounts, "[a]ll . . . rights of ownership must

be exercised by joint action."  MetLife Contract at ML0021.  In addition, "[j]oint certificate

owners own equal shares of any benefits accruing or payments made to them."  *Id.*

　　　　The contract's provision relating to withdrawals prior to annuitization provided as

follows:

> **Cash Surrender**
> You may elect by Written Request to receive the Cash Surrender
> Value of this certificate before the due date of the first Annuity or
> Income payment and without the consent of any Beneficiary unless

---

　　　　Although variable annuities are typically sold by insurance companies and bear some
characteristics of insurance, they are primarily used as tax-deferred investment vehicles.  *See SEC v. Variable
Annuity Life Ins. Co. of Am. ("VALIC")*, 359 U.S. 65, 70-73 (1959) (holding that variable annuities qualify as
securities rather than insurance under federal law, because variable annuities "guarantee nothing to the annuitant
except an interest in a portfolio of common stocks or other equities," and thus "the issuer of a variable annuity . . .
assumes no true risk in the insurance sense"); *Lander*, 251 F.3d at 105 ("[V]ariable annuities possess characteristics
akin to those of investment securities . . . , [m]ost notably [that] . . . the variable annuitant bears the investment risk
of the underlying securities.").  Unlike other insurance products, variable annuities must be registered as securities
with the U.S. Securities and Exchange Commission ("SEC"), and the policies must be offered through "separate
accounts," which must be registered with the SEC as investment companies under the Investment Company Act of
1940.  *VALIC*, 359 U.S. at 70-73; *Lander*, 251 F.3d at 105; N.Y. Ins. Law § 4240.  By contrast, "fixed annuities are
typically thought of as insurance products because the annuitant receives a guaranteed stream of income for life, and
the insurer assumes and spreads the 'mortality risk' of the annuity – the risk that the annuitant will live longer than
expected, thereby receiving benefits that exceed the amount paid to the seller of the policy."  *Lander*, 251 F.3d at
104.

[2]　　　　The money represented the proceeds from a personal injury lawsuit brought by Miguel against the
City of New York based on a back injury he sustained when he fell down some stairs while working on a painting
and construction job in 1998.  Miguel Dep. at 17-19 (Dash Dec., Ex. D, ECF No. 61).  Miguel received a settlement
of about $1.8 million.  *Id.* at 19.  After attorney's fees and costs were deducted, Miguel netted approximately
$900,000.  *Id.*  The settlement check was made out to both Miguel and his wife.  *Id.* at 20.  They decided to invest
these proceeds in the annuity contract.  *Id.*

irrevocably named.  You may elect either a full or partial surrender of the Certificate Cash Surrender Value.  In the case of a full surrender, this certificate will be canceled.  A partial surrender will result in a reduction in your Certificate Value. . . .

The Certificate Cash Surrender Value will be determined as of the next valuation following receipt of your Written Request.

*Id.* at ML0025.  The contract defines "Written Request" as "written information including requests for certificate changes sent to us in a form and content satisfactory to us and received at Our Office."  *Id.* at ML0020.  MetLife is the successor to Travelers Life & Annuity Co. with respect to the Account.  *Id.* at ML0056.

Lucy and Miguel have married and divorced two times.  They first married in 1987, and divorced in 1996.  They remarried in 2001, and divorced again on November 30, 2005.  Miguel Dep. at 11-12, 21 (Dash Dec., Ex. D, ECF No. 61).  After they purchased the Account in August 2003, Lucy made three withdrawals from the Account that effectively depleted its remaining value.

On April 11, 2005, Lucy requested a withdrawal of $319,000, to be paid as a direct deposit to a CitiBank checking account.  *See* April 2005 Withdrawal Slip (Dash Dec., Ex. F, ECF No. 61).[3]  Miguel is not pursuing any claims against MetLife with respect to this April 2005 withdrawal.  *See* Stipulation and Order dated Nov. 21, 2011 (ECF No. 52).  Therefore, this withdrawal is not at issue for purposes of this motion.

On November 11, 2005, just before their second divorce, Lucy faxed a letter to MetLife, addressed to the attention of "THE DEPARTMENT OF WITHDRAWALS" of "Travelifeaunity" [sic].  ML0081 (Lucy's 11/11/05 Letter, ECF No. 73-9).  The letter read in full:

---

[3]     The apparent signatures of both Lucy and Miguel appeared on the withdrawal request.

4

My SSN [is] \*\*\*-\*\*-4521 and my address is 65 14 Parson Blvd. Apt 1 b Flushing , NY 11365.I want to notify that I don't want any withdrawal from the account . That I have with Mr. Miguel Moreno unless I agree that 150,000 will go into my account and the rest will go in any account that he decide to put on. I remember the first time that Mr. Moreno withdrawal 200,000 dollars without my consent. And the time of April 11th the 200,000 and 319,000 was done by both of us. I want to have a report of the statement every month in my house in flushing. If you need any information you can contact me at \*\*\*-\*\*\*-2440.

     If anything will be done with [sic] my pre-permission traveler will be responsible.  Thank you for your time.

Sincerely, Lucy I Moreno

*Id.* (punctuation and spacing preserved; private information redacted).  The letter was signed by Lucy on November 11, 2005, and apparently faxed to MetLife the same day.  *See id.*

On September 15, 2006, after the divorce and allegedly without Miguel's knowledge, Lucy filled out and faxed a withdrawal request to MetLife for $220,000.  ML0074-75 (9/15/06 Withdrawal Req., Kaufman Dec., Ex. D, ECF No. 56).  The request bore the apparent signatures of both Lucy and Miguel, ML0075, although Miguel asserts that his signature was forged, Miguel Dep. at 26-27 (Dash Dec., Ex. D, ECF No. 61).  The withdrawal form provided by MetLife allowed the requestor to specify an "[a]lternate [p]ayee or [a]ddress" if the "withdrawals are to be paid to other than Owner and/or mailed to an address other than address of record."  ML0075.  Lucy completed that section to request that the check be mailed to 6514 Parson Blvd. Apt. 1B, Flushing, NY 11365.  *Id.*  This address differed from the address of record on the Account at the time, which was apparently an address in Santo Domingo in the Dominican Republic.  *See* ML0074; ML0141 (MetLife Quarterly Stmt. 6/30/06-9/30/06, ECF No. 73-7).  MetLife processed the withdrawal request and, on September 18, 2006, issued a

check to Miguel and Lucy as joint payees for $211,627.09,[4] payable from funds in the Account. BSC0011 (9/18/06 Check, Kaufman Dec., Ex. F, ECF No. 56).  The check was mailed to the address in Flushing, New York, that Lucy had supplied on the withdrawal request.  *Id.*; ML0104 (9/15/06 Partial Surrender Transaction Data, ECF No. 73-6).

On January 31, 2007, again allegedly without Miguel's knowledge, Lucy filled out another withdrawal request, this one for $151,000, and faxed it to MetLife.  ML0082 (1/31/07 Withdrawal Req., Kaufman Dec., Ex. G, ECF No. 56).  This request also bore the apparent signatures of both Lucy and Miguel.  *Id.*  MetLife processed the withdrawal request and, on February 1, 2007, issued a check to Miguel and Lucy as joint payees for $144, 609.37,[5] payable from funds in the Account.  BSC0029 (2/1/07 Check, Kaufman Dec., Ex. H, ECF No. 56).  The check was mailed per Lucy's withdrawal request to Barcelona 57, Puerta Hierro, Santa Domingo, Dominican Republic, which was the same address as the address of record for the Account at the time.  *See* BSC0029 (2/1/07 Check); ML0082 (1/31/07 Withdrawal Req.); ML0163 (1/31/07 Partial Surrender Transaction Data, ECF No. 72-1); ML0148 (MetLife Quarterly Stmt. 12/31/06-3/31/07, ECF No. 72-2).

Lucy negotiated both of the checks at a branch of Banco Multiple Santa Cruz ("BSC") located in the city of Santiago in the Dominican Republic, which deposited the funds into her savings account there.  Ortega Dep. at 35-37 (Kaufman Dec., Ex. I, ECF No. 56).[6]  The

---

[4]        MetLife deducted a "surrender charge[]" of $8,372.91 from the $220,000 that Lucy requested.  *See* ML0104 (9/15/06 Partial Surrender Transaction Data, ECF No. 73-6).

[5]        MetLife deducted a $6,390.63 "surrender charge[]" from the $151,000 that Lucy requested.  *See* ML0163 (1/31/07 Partial Surrender Transaction Data, ECF No. 72-1).

[6]        The BSC account into which the funds were deposited was in the name of Lucy Isabel Rodriguez-Martinez, which apparently is Lucy's maiden name.  *See* BSC0012; BSC0030; BSC Am. Compl. (ECF No. 12) ¶ 7.  The stamps on the back side of the September 2006 check indicate that it was deposited on October 4, 2006.  *See* BSC0012.  The markings on the February 2007 check do not indicate when it was deposited, *see* BSC0030, but BSC's amended complaint alleges that Lucy deposited it on February 13, 2007.  BSC Am. Compl. ¶ 9.

back side of the checks bore the apparent endorsement signatures of both Lucy and Miguel. BSC0012 (Kaufman Dec., Ex. F, ECF No. 56); BSC0030 (Kaufman Dec., Ex. H, ECF No. 56).

On July 19, 2007, nearly seven months after the last withdrawal, Miguel complained to MetLife for the first time that the last three withdrawals from his account had been made without his knowledge and that his signature had been forged on these withdrawal slips. *See* Service Issue Log, ML0201-02 (Kaufman Dec., Ex. J, ECF No. 56); *see also* Petroff Dep. at 166 (Kaufman Dec., Ex. J, ECF No. 56). In or around November 2007, Miguel submitted an affidavit of fraud to MetLife asserting that his endorsement signature on the September 2006 check for $211,672.09 had been forged. BSC Am. Compl. ¶ 11.[7] Accordingly, in December 2007, the clearing bank requisitioned the funds back from BSC based on "[f]raudulent endorsement." Ortega Dep. at 39; *see also* BSC Am. Compl. ¶ 13.[8] However, by the time the funds were recalled, Lucy had already emptied her BSC bank account. Ortega Dep. at 40.[9] In August 2009 – more than two years after his initial complaint about the unauthorized withdrawals – Miguel completed a second affidavit of fraud asserting he had never endorsed the February 2007 check for $144,609.37 and requesting that MetLife issue a new check to him.[10]

---

[7]     This affidavit of fraud does not appear in the record. BSC's amended complaint suggests that Miguel executed the affidavit on October 19, 2007, *see* BSC Am. Compl. ¶ 30, and that BSC received notice of it in mid-November 2007, *id.* ¶¶ 11-12.

[8]     The evidence is unclear as to which funds were requisitioned from BSC and the current status of those funds. The record evidence reflects that Miguel submitted to MetLife in 2009 an affidavit of fraud relating to the February 2007 check for $144,609.37, *see* Moreno Fraud Aff. (Dash Dec., Ex. E, ECF No. 61); there is no similar affidavit of fraud in the record relating to the September 2006 check for $211,627.09, although Moreno's counsel represented at oral argument that such an affidavit had been submitted. Eberlina Ortega, a manager of BSC, testified that according to her recollection, the check for $211,627.69 [sic], which was deposited first, eventually "bounced" because of "[f]raudulent endorsement," but the check for $144,609.37 did not bounce. Ortega Dep. at 37, 39 (Kaufman Dec., Ex. I, ECF No. 56). Miguel's counsel represented at oral argument that Wachovia Bank – the clearing bank – recalled the full amount of both checks, but was able to obtain only $144,000 from BSC, which remains in Wachovia's custody. MetLife's counsel represented that none of the funds have been returned to MetLife.

[9]     BSC's amended complaint alleges that the balance in Lucy's BSC account as of March 15, 2007, was $232.84, and that by December 2007, Lucy "had already withdrawn all funds from her savings account" with BSC. BSC Am. Compl. ¶¶ 10, 13.

[10]     The court is surmising the date of this affidavit based on the facsimile transmittal information printed at the top of the page and the faint outline of the notary public's date stamp.

Moreno Fraud Aff. (Dash Dec., Ex. E, ECF No. 61).  Miguel testified at his deposition that

although he received quarterly statements on the Account and knew Lucy was a joint owner, he

"never checked" the statements because he "didn't see any reason to check" them.  Miguel Dep.

at 187-88 (Kaufman Dec., Ex. K, ECF No. 56).

According to MetLife's operating procedures, when it receives a withdrawal

request, it ensures the withdrawal form is signed by the owner of the contract, and by the joint

owner if applicable.  Petroff Dep. at 78-79 (Kaufman Dec., Ex. E, ECF No. 56).  Checks are

made payable to both owners if the account is jointly owned.  *Id.* at 79.  For withdrawals over

$250,000, MetLife verifies the signature(s) for authenticity against a Data Collection Form.[11]  *Id.*

But for withdrawals under $250,000, MetLife checks the signature only to make sure that "it's

there and the name of the person who's on the account"; MetLife does not take steps to verify the

signature's authenticity.  *Id.*

B.      *Procedural History*

BSC initiated the instant action against Lucy and Miguel in March 2008, alleging

fraud and conspiracy to defraud.  *See* BSC Compl. (ECF No. 1); *see also* BSC Am. Compl. (ECF

No. 12).  Miguel answered the complaint and impleaded other parties through a third-party

complaint in which he asserted, *inter alia*, a single claim against MetLife for negligence.  *See*

Miguel's Third Am. Third-Party Compl. (ECF No. 54) ("TPC") ¶¶ 95-101.  MetLife answered

Miguel's third-party complaint.  *See* MetLife's Answer to TPC (ECF No. 58) ("MetLife

Answer").  On October 28, 2010, I granted the other third-party defendants' motion to compel

arbitration and dismiss all third-party claims against them.  *See* Minute Entry dated Oct. 27,

2010.  Upon consent of the parties, all remaining claims were stayed at that time.  *Id.*  On

---

[11]      In response to a court order, MetLife filed with the court at ECF No. 70 a copy of the Data
Collection Form that MetLife maintained on file for the Morenos' Account.

October 18, 2011, I lifted the stay of the non-arbitrable claims in the case.  *See* Order dated Oct.

18, 2011.  MetLife brought this motion for summary judgment at the conclusion of discovery.

*See* MetLife's Mo. for Summ. Judg. (ECF No. 56).  The court held oral argument on the motion

on March 2, 2012.  In response to orders from the court, MetLife has made two supplemental

submissions of relevant documentary evidence, one just before oral argument and the other two

days after.  (ECF Nos. 72, 73).[12]

DISCUSSION

A.    *Standard of Review*

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall

grant summary judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In making

this determination, I am required to assess the record in the light most favorable to the non-

movant and to draw all reasonable inferences in his favor.  *Ramos v. Baldor Specialty Foods,*

*Inc.*, 687 F.3d 554, 558 (2d Cir. 2012).

B.    *Analysis*

Miguel's third-party complaint alleges that MetLife was negligent in honoring

Lucy's withdrawal slips, asserting that MetLife "knew, had reason to know, or should have

known, in the exercise of reasonable care, that signatures purporting to be that of [Miguel] . . .

were forgeries."  TPC ¶ 100.  According to Miguel, MetLife "had a duty to inquire about, inspect

and examine said request for withdrawals before issuing monetary instruments to [Lucy]."  *Id.* ¶

101.  In its motion for summary judgment, MetLife first argues that "the negligence claim

against [MetLife] must be dismissed," because the only possible basis of MetLife's liability lies

---

[12]    The court is grateful to MetLife and its counsel for their responsiveness to the court's requests and candor in disclosing relevant documents.

in contract. Mem. of Law in Support of MetLife's Mo. for Summ. Judg. (ECF No. 56-17) ("MetLife Mem.") at 7-9. Second, even assuming a negligence claim is available to Miguel, MetLife argues that Miguel has failed to put forth sufficient evidence to establish a *prima facie* case of negligence against MetLife. *Id.* at 9-11. I address these arguments in turn.

        1.    *Contract Claim*

      MetLife first argues that any obligations of MetLife arose solely from its contractual relationship with Miguel, and therefore Miguel's sole remedy lies in contract. MetLife Mem. at 7-9. As MetLife explains, "a depositor may not sue his bank in negligence based solely on their contractual relationship." *Id.* at 8. By analogy, MetLife argues that it can be liable to Miguel if and only if it breached their contract. *See id.* at 7-9; *see also* MetLife Reply (ECF No. 64) at 9 ("There is no duty of care here distinct from [MetLife]'s contractual obligations.").

      I agree with MetLife that Miguel may assert a contract cause of action against MetLife. "Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages. Summary judgment is appropriate if the terms of the contract are unambiguous." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011) (internal citations omitted).

      A rational jury could find that MetLife is liable to Miguel for breach of contract. The agreement between MetLife and the Morenos expressly provides that when annuities are jointly-owned – as the Morenos' Account was – "[a]ll . . . rights of ownership [aside from transfers between sub-accounts] must be exercised by joint action." ML0021. Here, Miguel's testimony that he never signed the withdrawal requests creates an issue of fact regarding whether the withdrawals were in fact "joint[ly]" authorized, as required by the contract. If the jury finds

Miguel credible, then MetLife may have breached the contract by paying out the withdrawals despite the absence of "joint action."

The contract also specifies that cash withdrawals may be made by "Written Request," which is defined by the contract as "written information . . . in a form and content satisfactory to us and received at Our Office."  ML0020, ML0025.  The contract provides no other information regarding the criteria that MetLife is to use in evaluating whether a withdrawal request is "satisfactory" to it.  Yet the mere fact that the withdrawal procedure was poorly defined by the contract does not mean that MetLife is thus immunized from contractual liability in its processing of withdrawals.  *See Ambac Assurance UK Ltd. v. J.P. Morgan Inv. Mgmt., Inc.*, 88 A.D.3d 1, 10 (N.Y. App. Div. 2011) ("Action or non-action in accordance with a provision that limits rather than mandates certain actions does not immunize defendant from a breach of contract claim . . . .") (cited with approval by *Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC*, No. 11-4306-CV, 2012 WL 3156441, at *20 (2d Cir. Aug. 6, 2012)).

Miguel may employ the rules of contract law to supply this vague provision with more meaningful content.  Under New York law, contracts must be "construed in accord with the parties' intent."  *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002).  "[T]hat a specific promise has not been expressly stated does not always mean that it was not intended."  *Havel v. Kelsey-Hayes Co.*, 83 A.D.2d 380, 382 (N.Y. App. Div. 1981).  Insurance contracts in particular are to be interpreted based "on the reasonable expectations of the average insured upon reading the policy and employing common speech."  *Mostow v. State Farm Ins. Cos.*, 88 N.Y.2d 321, 326-27 (1996) (internal quotation marks and citations omitted).  "[A]mbiguities in an insurance policy should be construed in favor of the insured and against the insurer, the drafter of the policy language."  *Id.* at 326.

11

Moreover, "[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995). The duties of good faith and fair dealing "encompass 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included[.]'" *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002) (quoting *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (1978) (internal quotation marks omitted)); *accord M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) ("[C]ourts employ the good faith performance doctrine to effectuate the intentions of the parties, or to protect their reasonable expectations." (quoting Steven J. Burton, *Breach of Contract and the Common Law Duty To Perform in Good Faith*, 94 Harv. L. Rev. 369, 371 (1980)) (alteration in original)); 23 Richard A. Lord, Williston on Contracts § 63:21 (4th ed. 2012)) ("A contract includes not only the promises set forth in express words, but, in addition, all such implied provisions as are indispensable to effectuate the intention of the parties and as arise from the language of the contract and the circumstances under which it was made."). In other words, all contracts "embrace[] a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract[.]'" *Dalton*, 87 N.Y.2d at 389 (quoting *Kirke La Shelle Co. v Armstrong Co.*, 263 N.Y. 79, 87 (1933)).[13] "Where the

---

[13]        As Justice Cardozo wrote nearly 100 years ago, "The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view to-day. A promise may be lacking, and yet the whole writing may be instinct with an obligation, imperfectly expressed. If that is so, there is a contract." *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 90-91 (1917) (internal quotation marks omitted). Thus, a court should interpret a contract to include an implicit promise where, "[w]ithout [the] implied promise, the transaction cannot have such business efficacy as both parties must have intended that at all events it should have." *Id.* at 91 (internal quotation marks omitted).

More recently, the Second Circuit has echoed this view in interpreting New York law:

> In general, courts enforce the implied covenant where an implied promise was "so interwoven in the whole writing" of a contract as to be necessary for effectuation of the purposes of the contract. Similarly, where a party's acts subsequent to performance on the contract so directly destroy the value of the

contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion[.]" *Id.* However, the duty of good faith and fair dealing cannot impose an obligation "that 'would be inconsistent with other terms of the contractual relationship[.]'" *Id.* (quoting *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (1983)); *see also Hard Rock Cafe Int'l, (USA), Inc. v. Hard Rock Hotel Holdings, LLC*, 808 F. Supp. 2d 552, 567 (S.D.N.Y. 2011) (applying New York law) ("This covenant does not add obligations beyond those set forth in the agreement; rather, it protects a party to a contract from improper conduct that subverts the contract itself." (internal quotation marks and alteration omitted)).

Here, a reasonable annuitant in Miguel's position at the time of contracting may well have been justified in understanding that the contract implicitly bound MetLife to employ reasonable procedures to safeguard against fraud when discharging its contractual obligation to accept only written withdrawal requests "in a form and content satisfactory" to MetLife. After all, reasonable parties entrusting sizeable investments with large financial institutions reasonably expect that the institution will safeguard those investments from fraudulent and unauthorized withdrawals.

At oral argument, counsel for MetLife argued that MetLife's contractual obligation extended only to ensuring that Lucy's and Miguel's names both appeared on the withdrawal request. In response to the court's various hypotheticals, counsel for MetLife responded that even if Miguel's signature had been "obviously forged," MetLife had no duty under the contract to "look beyond the fact that the name happens to be there." Trans. at 11.

_____

contract for another party that the acts may be presumed to be contrary to the intention of the parties, the implied covenant of good faith may be implicated.

*Galesi*, 904 F.2d at 136 (internal citations omitted) (quoting *Havel*, 83 A.D.2d at 384; citing *Roli-Blue, Inc. v. 69/70th Street Assocs.*, 119 A.D.2d 173 (N.Y. App. Div. 1986)).

Indeed, counsel for MetLife went so far as to insist that even if the withdrawal slip had been faxed from a federal prison, with both Lucy's and Miguel's signatures "clearly forged," and requested that payment be made to Bernie Madoff as payee and mailed to Madoff at his address in federal prison, MetLife still would be under no obligation under the contract to investigate the request in any way before paying out as directed by the withdrawal request. *See* Trans. at 11-13. I can find no basis in the contract for such a narrow construction of MetLife's responsibilities. To the contrary, I believe that a jury could conclude that a reasonable investor of $700,000 would reasonably believe that the contractual terms of "Written Request" and "joint action" would obligate MetLife to adopt verification procedures to ensure that the actual owners of the Account are in fact "joint[ly]" authorizing any actions taken, and that MetLife would not find a written request "satisfactory" to it unless the request satisfied basic identity verification safeguards. In other words, no reasonable investor would understand these terms – which, are, after all, terms of limitation – to confer on MetLife the freedom to hand over the entire investment to the first fraudster to write the names "Lucy Moreno" and "Miguel Moreno" on a piece of paper and fax it to MetLife, no matter how obvious the fraud. A jury could reasonably conclude that adopting MetLife's extreme construction of the contract would have the effect "of destroying or injuring [Miguel's] right . . . to receive the fruits of the contract," in direct contravention of the duty of good faith and fair dealing. *See Dalton*, 87 N.Y.2d at 389 (internal quotation marks omitted).

Accordingly, because I agree that MetLife may be liable to Miguel under their contract, Miguel's complaint is hereby deemed amended include a claim for breach of contract against MetLife. In civil cases, I may freely permit parties to amend pleadings to conform them to the evidence presented. *See* Fed. R. Civ. P. 15(b); *see also* Fed. R. Civ. P. 54 ("Every . . . final

14

judgment [other than a default judgment] should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings.").  Allowing such an amendment here aids in the presentation of the merits of Miguel's claim, permits Miguel to receive the relief to which he may be entitled, and does not prejudice MetLife's defense of the action.  *Cf.* Fed. R. Civ. P. 15(b), 54.  This amendment imposes no unfair surprise on MetLife, as MetLife itself has argued since the inception of this case that MetLife's "liability – if any – will lie under the contract."  MetLife Mem. at 9; *see also* Trans. at 10 ("[T]he breach of contract claim . . . is the only claim that we think [Miguel] has the ability to assert . . . .").

        2.    *Tort Claim*

      Contrary to MetLife's argument, however, the possibility that Miguel may recover in contract does not require dismissal of his tort claim.  Miguel may plead claims for negligence and breach of contract in the alternative, and both may be submitted to the jury.  As the Second Circuit has explained, the "[n]egligent performance of a contract may give rise to a claim sounding in tort as well as one for breach of contract."  *Ajax Hardware Mfg. Corp. v. Indus. Plants Corp.*, 569 F.2d 181, 185 (2d Cir. 1977) (citing Prosser, The Law of Torts § 92 (4th ed. 1971); Restatement (Second) of Torts §§ 323, 324A (1965)).  "The two claims may be submitted as alternatives to the jury, as a matter of both New York substantive law, and federal procedural law."  *Id.* (internal citations omitted) (citing *Victorson v. Bock Laundry Machine Co.*, 37 N.Y.2d 395 (1975); Fed. R. Civ. P. 8(e)(2) ("A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses."), *now codified in substance at* Fed. R. Civ. P. 8(d)(2)).  Although the negligent performance of a contract is not necessarily always actionable as a tort, "[a] person is not necessarily insulated from liability in tort merely because he or she is engaged in performing

a contractual obligation." *Landon v. Kroll Lab. Specialists, Inc.*, 91 A.D.3d 79, 83 (N.Y. App. Div. 2011); *see also Bayerische Landesbank*, 2012 WL 3156441, at *14 ("Where an independent tort duty is present, a plaintiff may maintain both tort and contract claims arising out of the same allegedly wrongful conduct."); *Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp.*, 725 F. Supp. 656, 661 (N.D.N.Y. 1989) ("[T]he existence of a contract does not necessarily bar a tort claim. . . ."). Thus, MetLife is not insulated from liability on Miguel's tort claim simply because their relationship derived from a contract.

To establish a *prima facie* claim of negligence under New York law, a plaintiff must show (1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached that duty; and (3) the plaintiff suffered damage (4) as a proximate result of that breach. *See Lombard v. BoozAllen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002).

a.    *Duty*

MetLife argues as a matter of law that it did not owe Miguel a duty of care cognizable by tort law. Just as "a depositor may not sue his bank in negligence based solely on their contractual relationship," MetLife argues, so Miguel cannot assert a legally cognizable tort claim against MetLife, which has no "special or confidential relationship" with "its depositors." MetLife Mem. at 8-9 (citing *Clark v. Metro. Life Ins. Co.*, 461 F. App'x 538, 539 (9th Cir. 2011), *aff'g Clark v. Metro. Life Ins. Co.*, No. 08-cv-00158, 2010 WL 3636194 (D. Nev. Sept. 10, 2010)).

The New York Court of Appeals has explained:

> The existence and scope of an alleged tortfeasor's duty is, in the first instance, a legal question for determination by the court. In analyzing questions regarding the scope of an individual actor's duty, the courts look to whether the relationship of the parties is such as to give rise to a duty of care, whether the plaintiff was within the zone of foreseeable harm, and whether the accident was

> within the reasonably foreseeable risks.  The nature of the inquiry
> depends, of course, on the particular facts and circumstances in
> which the duty question arises.  The analysis is also driven by
> considerations of public policy. . . . [T]he common law of torts is,
> at its foundation, a means of apportioning risks and allocating the
> burden of loss.

*Di Ponzio v. Riordan*, 89 N.Y.2d 578, 583 (1997) (internal quotation marks and citations omitted); *see also Lauer v. City of New York*, 95 N.Y.2d 95, 108 (2000) ("Liability sounding in negligence must first be premised upon a finding of a legal duty owed by the defendant to the plaintiff.  The concept of legal duty merges logic, science and public policy to determine whether the plaintiff's interests are entitled to legal protection against a defendant's conduct." (internal citation omitted)).  As a general rule, "whenever one person is by circumstances placed in such a position with regard to another that every one of ordinary sense . . . would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to the circumstances he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger."  *Lauer*, 95 N.Y.2d at 109 (quoting *Havas v. Victory Paper Stock Co.*, 49 N.Y.2d 381, 386 (1980)).

"Under New York law, a breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated."  *Bayerische Landesbank*, 2012 WL 3156441, at *14.  "Such a 'legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent on the contract.'"  *Id.* (quoting *Clark-Fitzpatrick v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987)); *accord Rich v. N.Y. Cent. & Hudson Riv. R.R. Co.*, 87 N.Y. 382, 390 (1882) ("[A] tort is described in general as a wrong independent of contract.  And yet, it is conceded that a tort may grow out of, or make part of, or be coincident with, a contract . . . ." (internal quotation marks omitted)).

17

"The very nature of a contractual obligation, and the public interest in seeing it performed with reasonable care, may give rise to a duty of reasonable care in performance of the contract obligations, and the breach of that independent duty will give rise to a tort claim." *Landon*, 91 A.D.3d at 83 (quoting *N.Y. Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 316 (1995)).[14] "Furthermore '[a] legal duty independent of contractual obligations may be imposed by law as an incident to the parties' relationship[.]'" *Id.* (quoting *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 551 (1992) (first alteration in original)); *see also Bouquet Brands Div. of J & D Food Sales, Inc. v. Citibank (New York State), N.A.*, 97 A.D.2d 936, 937 (N.Y. App. Div. 1983) ("A tort action may accompany one for breach of contract . . . where the contract creates a relation out of which springs a duty, independent of the contract obligation, and that independent duty is breached."). "In this regard '[p]rofessionals, common carriers and bailees, for example, may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties[.]'" *Landon*, 91 A.D.3d at 83 (quoting *Sommer*, 79 N.Y.2d at 551 (first alteration in original)).[15] "In these instances, it is policy, not the parties' contract, that gives rise

---

[14]     New York courts frequently hold that "[a] person undertaking to perform work is charged with the common law duty to exercise reasonable care and skill in the performance of the work." *Trans Caribbean Airways, Inc. v. Lockheed Aircraft Serv.-Int'l, Inc.*, 14 A.D.2d 749, 749 (N.Y. App. Div. 1961); *see also Int'l Fid. Ins. Co. v. Gaco Western*, 229 A.D.2d 471, 474 (N.Y. App. Div. 1996) ("A person charged with performing work under a contract must exercise reasonable skill and care in performing the work and negligent performance of the work may give rise to actions in tort and for breach of contract[.]"); *Rozner v. Resolute Paper Products Corp.*, 37 A.D.2d 396, 398 (N.Y. App. Div. 1971) ("A contract may create a duty, not otherwise existing, from which negligence may arise, but the negligence arises not because of a breach in the contract but because of a failure to perform the contractual duty with due care."); *Rosenbaum v. Branster Realty Corp.*, 276 A.D. 167, 168 (N.Y. App. Div. 1949) ("Where a person contracts to do certain work he is charged with the common law duty of exercising reasonable care and skill in the performance of the work required to be done by the contract.  It is the breach of the duty imposed by law and not of the contract obligation which constitutes the tort." (citation omitted)); *Cox v. Mason*, 89 A.D. 219, 221 (N.Y. App. Div. 1903) ("Whoever by contract assumes a duty to another person is liable, in an action on the case, to such other person, for damages arising from the negligent performance of such duty." (quoting Wharton on Negligence § 435 (2d ed.)); *cf. Milau Assocs. v. N. Ave. Dev. Corp.*, 42 N.Y.2d 482, 486-87 (1977) (holding that "reasonable care and competence owed generally by practitioners in the particular trade or profession defines the limits of an injured party's justifiable demands" in tort for negligent provision of services); *see generally* 79 N.Y. Jur. 2d Negligence § 25.

[15]     *See also Rich*, 87 N.Y. at 395 (providing examples of a "contract of affreightment, where, beyond the contract obligation to transport and deliver safely, there is a duty, born of the relation established to do the same thing," and "kindred cases of principal and agent, of lawyer and client, of consignor and factor," where "the contract

to a duty of due care." *Id.* (quoting *Sommer*, 79 N.Y.2d at 552). Thus, "[w]here an independent tort duty is present, a plaintiff may maintain both tort and contract claims arising out of the same allegedly wrongful conduct." *Bayerische Landesbank*, 2012 WL 3156441, at *14. "Conversely, where a party is merely seeking to enforce its bargain, a tort claim will not lie[.]" *N.Y. Univ.*, 87 N.Y.2d at 316.

It appears to be an open question whether New York law recognizes a negligence claim by a variable annuity–holder against the insurance company that issued the annuity for the negligent processing of forged withdrawal requests. New York law generally holds that the relationship between an insurance company and its policyholder is contractual only. *See, e.g.*, *Murphy v. Kuhn*, 90 N.Y.2d 266, 270-71 (1997); *Batas v. Prudential Ins. Co. of Am.*, 281 A.D.2d 260, 264 (N.Y. App. Div. 2001) ("No special relationship of trust or confidence arises out of an insurance contract between the insured and the insurer; the relationship is legal rather than equitable[.]"); *Freeman v. MBL Life Assur. Corp.*, 60 F. Supp. 2d 259, 266 (S.D.N.Y. 1999) ("Under New York law the relationship between an insurance company and a policyholder is a contractual relationship, not a fiduciary one."); *Rochester Radiology Associates, P.C. v. Aetna Life Ins. Co.*, 616 F. Supp. 985, 988 (W.D.N.Y. 1985).

---

establishes a legal relation of trust and confidence; so that upon a breach of the contract there is not merely a broken promise, but . . . there is [also] trust betrayed and confidence abused").
The Second Department elaborated:

> Historically, "[o]ne of the earliest appearances of what we now know as negligence was in the liability of those who professed to be competent in certain 'public' callings." "A carrier, an innkeeper, a blacksmith, or a surgeon, was regarded as holding oneself out to the public as one in whom confidence might be reposed, and hence as assuming an obligation to give proper service, for the breach of which, by any negligent conduct, he might be liable."

*Landon*, 91 A.D.3d at 83-84 (quoting Prosser and Keeton on Torts § 28, at 161 (5th ed. 1984)) (internal citation omitted).

However, because variable annuities are more like investment vehicles than traditional insurance,[16] considerable precedent exists for holding insurance companies to different standards when issuing variable annuities rather than other insurance products.  *See, e.g.*, *VALIC*, 359 U.S. at 70-73 (holding that variable annuities do not qualify as "insurance" under federal law, and thus are not exempt from compliance with the Securities Act of 1933 and the Investment Company Act of 1940, because variable annuities "guarantee nothing to the annuitant except an interest in a portfolio of common stocks or other equities," and thus "the issuer of a variable annuity . . . assumes no true risk in the insurance sense"); *Lander*, 251 F.3d at 105 (noting that "[v]ariable annuities are typically characterized as 'hybrid products,' possessing characteristics of both insurance products and investment securities," and that the most notable way that variable annuities resemble investment securities is that "the variable annuitant bears the investment risk of the underlying securities"); N.Y. Ins. Law § 4240 (requiring that variable annuities be issued through "separate accounts," unlike other insurance products).  Indeed, New York imposes on insurance companies a statutory duty of care in their handling of variable annuities.  *See* N.Y. Ins. Law § 4240 ("The insurer shall invest and reinvest for such separate account in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances.").

Moreover, there is precedent for recognizing negligence claims in analogous contexts.  It is not uncommon for investment companies to be liable to their investor-customers in tort.  *See, e.g.*, *Bayerische Landesbank*, 2012 WL 3156441, at *15 (holding that investment manager may be liable to investor in tort for gross negligence); *Muller-Paisner v. TIAA*, 289 F.

---

[16]      Indeed, counsel for MetLife represented at oral argument that this annuity was never intended to be used for its ostensible insurance function – the making of periodic payments to the annuitant for the duration of his lifetime.  Instead, the principal would be invested in securities like mutual funds, and then, after the investment had grown in value during the accumulation phase, Miguel and Lucy would simply withdraw the funds.  *See* Trans. at 7-8.

App'x 461, 466 (2d Cir. 2008) (reversing district court on ground that company offering fixed

annuity undertook a relationship of trust and confidence sufficient to plausibly allege a fiduciary

relationship and thus plaintiff had stated a tort claim for negligent misrepresentation); *Grund v.*

*Delaware Charter Guarantee & Trust Co.*, 788 F. Supp. 2d 226, 247 (S.D.N.Y. 2011) (denying

motion to dismiss negligence claim under New York law against trustee of retirement accounts

where retirement accounts were invested in fund which proved to be a Ponzi scheme),

*reconsideration granted in part and denied in part on unrelated grounds*, 2011 WL 3837146

(S.D.N.Y. Aug. 30, 2011); *A.B. Realty Corp. v. Metro. Life Ins. Co.*, 164 F. Supp. 2d 296, 304

(D. Conn. 2001) (holding MetLife liable in tort for negligent disbursements from annuity

contract), *aff'd in part, vacated in part*, 45 F. App'x 34 (2d Cir. 2002).  Although the duty in

such circumstances is generally born of a fiduciary relationship, *see, e.g.*, *Murphy*, 90 N.Y.2d at

270-72 (noting that fiduciary duties may arise in the insurance context if the requisite trust and

confidence is established); *Kimmell v. Schaefer*, 89 N.Y.2d 257, 263 (1996) (holding that

defendants who "possess unique or specialized expertise, or who are in a special position of

confidence and trust with the injured party" may be liable for negligent misrepresentations in

investment context); *Batas*, 281 A.D.2d at 264 (recognizing that fiduciary duties may arise in the

insurance context where circumstances are appropriate), a fiduciary obligation is not the only

obligation that can run between contracting parties.  Miguel need not prove that MetLife owed

him a fiduciary duty to prevail on his negligence tort, which requires only a duty of reasonable

care.  Miguel does not allege that MetLife breached a fiduciary duty, for example by pursuing a

wrongheaded investment strategy, self-dealing, or otherwise squandering his investment by

abandoning a fiduciary role.  Rather, Miguel's claim is a simple negligence claim – that MetLife

paid out on a forged withdrawal request in circumstances in which no prudent financial

institution would do so.  MetLife need not have assumed a fiduciary duty to Miguel to be liable for having breached this lesser duty.

The closest analogy for Miguel's claim is that of a depositor against his bank for the negligent processing of unauthorized withdrawal requests.[17]  Both common law and statutory law in New York hold banks liable for negligently paying out on forged withdrawal slips.  *See, e.g.*, *Novak v. Greater N.Y. Sav. Bank*, 30 N.Y.2d 136, 141-42 (1972) (holding that bank must "exercise[] due care and diligence in ascertaining the identity of the person to whom it has given the money" in a withdrawal transaction because a bank is "charged with the responsibility of

---

[17]     MetLife itself has fervently advocated all along that I draw on principles of banking law to analyze Miguel's claim.  *See* MetLife Reply at 7 ("The reality is that a customer's withdrawals from an annuity bear a significant resemblance to a traditional bank account transaction and they are often treated similarly by the courts."); Trans. at 13 ("THE COURT: . . . What kind of transaction was this, is this a banking transaction?  MS. KAUFMAN: I think it would be considered a banking transaction.").  Of course, MetLife wishes banking law to apply only for the limited proposition that "a contract cause of action is generally the legal theory of recovery available to a depositor against his bank."  *See* Met Life Mem. at 7 (quoting *Tevdorachvili v. Chase Manhattan Bank*, 103 F. Supp. 2d 632, 640 (E.D.N.Y. 2000)).  MetLife does not wish me to apply banking law's specific rules of *liability*.

But the limitation on relief in banking transactions to contract is intrinsically intertwined with the highly-developed rules of liability that New York imposes on such transactions as a matter of law.  Although these rules of liability have historically been treated as part of the depositor-bank "contract," and thus claims asserting them are referred to as contract claims, the rules are in fact supplied by law, not by contract in the traditional sense.  They do not derive from, nor can they be altered by, the parties' written agreement, and they have nothing to do with the intentions of the parties at the time of contracting.  *See, e.g.*, N.Y. U.C.C. Law § 4-103(1) ("[N]o agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care . . . .").  Thus, given this framework of liability rules that apply to banking transactions as a matter of law, courts have been reluctant to add a threat of tort liability to those same transactions.  *See Stella Flour & Feed Corp. v. Nat'l City Bank of New York*, 285 A.D. 182, 183-84 (N.Y. App. Div. 1954) (holding that, given the "old and well-settled rule of high contractual responsibility" that "has been imposed on banks in paying money chargeable against their depositors' accounts," courts should not impose additional responsibility in tort, as that "would push a banker's responsibility to a point far beyond the area in which the banking and commercial community have been led to believe that responsibility ended"; thus, "[t]he theory of tort liability may be discovered to overrun into breaches of contract in a very limited area; but the payment charged to a depositor's account by a bank on forged or altered drafts certainly does not come within that area").

No party has argued, nor can they, that the specific statutory rules governing banking transactions control the disposition of this case.  *See, e.g.*, N.Y. Banking Law § 676 (dealing with unauthorized withdrawals "from any *savings account or time deposit account* maintained in any banking organization" (emphasis added)); *see also Tevdorachvili*, 103 F. Supp. 2d at 640 ("[O]n its face § 676 has no bearing whatever . . . in cases involving checking accounts . . . ."); *see also* N.Y. U.C.C. Law § 1-201(4) (defining "bank" as "any person engaged in the business of banking"); *cf. Woods v. MONY Legacy Life Ins. Co.*, 84 N.Y.2d 280, 284 (1994) (treating a life insurance company as a "bank" for purposes of U.C.C. where the company maintained for the plaintiff a money market account that resembled an ordinary checking account, and even issued the customer a checkbook for the purpose of making withdrawals from the account) (citing N.Y. U.C.C. § 1-102(1)).  This case does not involve a forged or altered draft charged to a customer's checking account, nor does it involve an unauthorized withdrawal from a savings account.  Therefore, the precedents disclaiming the availability of torts in those contexts are not controlling.  Yet the long-standing public policies underlying the liability rules of banking transactions may nonetheless help illuminate the public policy considerations relevant to this case.

22

safeguarding the interests of its depositors"); *Noah v. Bowery Sav. Bank*, 225 N.Y. 284, 288

(1919) ("The rule is well established that the bank cannot rely in making payment solely upon

the possession and presentation of the bank book . . . , but must exercise ordinary care and

diligence to ascertain that the person receiving the money is entitled to it."); *Gearns v. Bowery*

*Sav. Bank*, 135 N.Y. 557, 562 (1892) ("It is well settled . . . that payment made to a person who

is not in fact entitled to draw the deposit, though he may have possession of the book and present

it at the time of payment, will not discharge the bank, unless it exercised at least ordinary care

and diligence in paying the money to the wrong person."); *Appleby v. Erie County Sav. Bank*, 62

N.Y. 12, 17 (1875) (holding that, in spite of contractual provision purporting to absolve the bank

of liability for honoring a fraudulent withdrawal slip, "the contract between the parties" does

"not dispense with the [duty to] exercise . . . ordinary care on the part of the officers of the

bank"); *Renzi v. Aleszczyk*, 44 A.D.2d 648, 649 (N.Y. App. Div. 1974) ("[T]he bank has a duty

to exercise care and diligence to determine if the party requesting the withdrawal had a right to

receive the requested funds."); *Silverman v. Wachovia Bank, N.A.*, No. 09-CV-1371 (SJF)

(AKT), 2010 WL 5090990, at *3, *7, *9 (E.D.N.Y. Dec. 3, 2010) (denying reconsideration of

order holding that "a bank plainly has a duty not to advance proceeds from a customer's loan to a

person who is not authorized to receive those funds," and that the plaintiffs had stated a

"plausible claim for negligence against Wachovia" based on their allegations that Wachovia

advanced funds without contacting the plaintiffs to verify the validity of a putative power of

attorney); *see generally* 9 N.Y. Jur. 2d Banks § 334 ("Where payment is made to a person

wrongfully in possession of the passbook, the bank is liable if, under all the circumstances of the

case, it was negligent in making the payment without further inquiry or precaution."); 10 Am.

Jur. 2d Banks & Financial Institutions § 831 (same).[18]

---

[18]     *Cf.* N.Y. U.C.C. Law § 4-406 (providing that customer is not precluded from asserting a claim

It is true that in such cases, the depositor's claim is not one for tort; rather, the depositor asserts a claim for nonpayment of debt upon demand, and the bank's non-negligence in processing the prior withdrawal arises by way of affirmative defense. *See Novak*, 30 N.Y.2d at 141-42 ("The parties stand in a debtor-creditor relationship. Where the bank defends [against a claim of nonpayment of deposit upon demand] upon the ground that the debt has been paid to a person presenting a passbook, it bears the burden of proving that defense . . . ."); *Noah*, 225 N.Y. at 288-89 ("The action was for money which the defendant owed to the plaintiff. The debt was admitted. The defense was payment to a third party under such circumstances of care and diligence as to relieve the bank from liability."); *Kelley v. Buffalo Sav. Bank*, 180 N.Y. 171, 179 (1904) (holding that a bank may "protect itself against a . . . demand for payment by the . . . depositor" by showing that it exercised "care and diligence in making payment to the person presenting the passbook" (quoting *Mahon v. S. Brooklyn Sav. Inst.*, 175 N.Y. 69, 72 (1903))); *Holland v. Greater N.Y. Sav. Bank*, 222 A.D.2d 654, 655 (N.Y. App. Div. 1995) ("Both at

---

against his bank for wrongfully paying an item based on an unauthorized signature, even if the customer failed to detect the error promptly, "if the customer establishes lack of ordinary care on the part of the bank in paying the item(s)"); *cf. also Greenberg, Trager & Herbst, LLP v. HSBC Bank USA*, 17 N.Y.3d 565, 577-78 (2011) (implying that UCC § 4-406 imposes on bank a duty to exercise ordinary care in implementing procedures to detect counterfeit checks); *Stella Flour*, 285 A.D. at 184 ("[W]here there have been forgeries or alterations in drafts or checks it has been a long and consistent judicial policy in New York to require the bank to assume the loss.").

Indeed, it is clear that if the Account were a savings account, MetLife would be liable under New York statute for the withdrawal made on a forged signature, regardless of any due care exercised by MetLife. *See* N.Y. Banking Law § 676 ("Any withdrawal of moneys from any savings account . . . maintained in any banking organization . . . which is made by means of an unauthorized signature is wholly inoperative as to the person whose name is signed unless such person has authorized or ratified such withdrawal or is precluded from denying such withdrawal because he has received a portion of the funds withdrawn . . . . No such banking organization . . . shall interpose the defense, in an action for recovery by a depositor of money paid upon an unauthorized signature, that it has exercised due care and diligence in ascertaining the identity of the person to whom it has paid such money."); *see also Am. Lodge Ass'n, Inc. v. E. N.Y. Sav. Bank*, 100 A.D.2d 281, 285 (N.Y. App. Div. 1984) ("Section 676 of the Banking Law provides . . . in simple and direct language, that when a bank pays out funds from a savings or time deposit account based on an unauthorized signature, it is the bank, rather than the depositor, that must bear the burden of any loss resulting therefrom because the withdrawal is wholly inoperative as to the depositor. It is no defense that the bank exercised due care and diligence in ascertaining the identity of the person to whom it has paid the money."). Nor would it matter that MetLife issued the check in both Lucy's and Miguel's names. *See Am. Lodge*, 100 A.D.2d at 285-86 ("[T]he mere placement of the depositor's name on the check representing the funds withdrawn is of no significance to the depositor if in fact a forger received the check and was able to obtain the funds represented by the check by way of a second forged indorsement. . . . The Legislature has determined that it is the bank that bears the burden of loss where payment is made on a forged signature . . . .").

common law and under UCC 4-103, when a bank is sued for negligent release of a depositor's money, it must show by a preponderance of the evidence that, under the circumstances, it exercised due care and diligence . . . .").[19]

Nonetheless, I find the public policy interest in "safeguarding the interests of . . . depositors" against the negligent release of their funds, *Novak*, 30 N.Y.2d at 142, carries similar force in the present context, and supports the imposition on MetLife of a duty – independent of its contractual obligations – to process withdrawal requests from its customers' accounts in a non-negligent fashion. *See N.Y. Univ.*, 87 N.Y.2d at 316 ("The very nature of a contractual obligation, and the public interest in seeing it performed with reasonable care, may give rise to a duty of reasonable care in performance of the contract obligations, and the breach of that independent duty will give rise to a tort claim[.]").  Such a duty is independent of and "extraneous to" its contractual obligations, although it springs from the parties' contract. *See Bayerische Landesbank*, 2012 WL 3156441, at *14.  "Rather than arising out of the will or intention of the parties," the duty is "predicated largely on considerations of sound social policy."  *Victorson*, 37 N.Y.2d at 401 (internal quotation marks omitted).  After all, MetLife holds itself out as a secure financial institution, and the public has an interest in seeing contracts governing large monetary investments performed with reasonable care.  Thus, I conclude that the parties' contract spawned an independent duty that required MetLife to safeguard such investments from fraudulent depletion by processing withdrawal requests in a non-negligent manner.  *Cf. Appleby*, 62 N.Y. at 17 ("It is necessary and proper that rules and regulations should

---

[19]    *See also* 10 Am. Jur. 2d Banks and Financial Institutions § 757 ("The relationship between a bank and its depositors is a purely contractual one, so that depositors cannot sue a bank in negligence or tort for its alleged failure to carry out instructions.  Rather, the depositor may bring a contract action on the theory that the bank receives the deposit on the agreement to repay it on demand or order."); *id.* § 758 ("While payment of a deposit is a defense to an action to recover the deposit, the bank has the burden of sustaining its plea of payment by proof that the money has been paid out on a valid check or other order drawn by the depositor.").

be prescribed for the payment of money deposited in savings banks . . . .  They constitute, if properly communicated and assented to by the depositor, the contract between the parties.  *But these rules do not dispense with the exercise of ordinary care on the part of the officers of the bank*." (emphasis added)).  At the very least, I find that the question is close enough that I will assume for present purposes that such a duty exists, and proceed to examine whether Miguel has presented sufficient factual evidence in support of his claim that MetLife breached that duty to warrant consideration by a jury.[20]

          b.    *Breach of the Duty*

Conduct is considered negligent when it "falls beneath the standard of care which would be exercised by a reasonably prudent person in similar circumstances at the time of the conduct at issue."  *Harper v. United States*, 949 F. Supp. 130, 132 (E.D.N.Y. 1996) (citing *Holland v. United States*, 918 F. Supp. 87, 89 (S.D.N.Y. 1996)); *see also Landon*, 91 A.D.3d at 84 ("[A]n act may be negligent if it is done without the competence which a reasonable man in the position of the actor would recognize as necessary to prevent it from creating an unreasonable risk of harm to another[.]" (quoting Restatement (Second) of Torts § 299 (1965))). Because "reasonable care" dictates different actions in different circumstances, the scope of a potential tortfeasor's duty in a particular case depends on such factors as the nature of the tortfeasor's activity and the likelihood and gravity of any harm to the plaintiff that could result. *See Bethel v. N.Y.C. Transit Auth.*, 92 N.Y.2d 348, 356 (1998) (holding that "the . . . reasonable person standard is sufficiently flexible by itself to permit courts and juries fully to take into

---

[20]      I am cognizant that the question of whether such a duty exists – a precondition to Miguel's ability to prevail on a negligence claim – is a question of law for the court to decide: "The existence and scope of an alleged tortfeasor's duty is, in the first instance, a legal question for determination by the court."  *Di Ponzio*, 89 N.Y.2d at 583; *see also Lauer*, 95 N.Y.2d at 108 ("Liability sounding in negligence must first be premised upon a finding of a legal duty owed by the defendant to the plaintiff.").  I here conclude that such a duty likely exists under New York law, and that it is a close enough question that I ought to permit the claim to be heard by a jury so long as the evidence could rationally permit a verdict in Miguel's favor.  MetLife is free to revisit this antecedent legal question if and when the jury's verdicts render it necessary.

account the ultrahazardous nature of a tortfeasor's activity," and "application of the reasonable person standard will result in a sliding scale of due care factually commensurate to the danger involved under the circumstances of the particular case" (internal quotation marks omitted)); *J.D. Cousins & Sons, Inc. v. Hartford Steam Boiler Inspection & Ins. Co.*, 341 F.3d 149, 155 (2d Cir. 2003) ("The greater the risk, the higher the standard of reasonable care.") (applying New York law); *see also Kelley*, 180 N.Y. at 178 ("Upon reflection it becomes obvious . . . that the only practicable general rule to which savings banks can be safely held in such dealings is the rule of ordinary care, leaving it to be applied in the light of the special circumstances that characterize each separate case.").

"[T]he degree of care that a reasonably prudent person would use under the circumstances may be established through evidence of the general customs and practices of others who are in the same business or trade as that of the alleged tortfeasor." *Landon*, 91 A.D.3d at 84 (citing, *inter alia*, *Trimarco v. Klein*, 56 N.Y.2d 98, 105 (1982)); *see also AG Capital Funding Partners, L.P. v. State Street Bank & Trust Co.*, 5 N.Y.3d 582, 594 (2005) ("[E]vidence of industry practice and standards is admissible to establish a duty of care[.]" (internal quotation omitted)).[21]  However, it need not be: Although "[c]ourts will not lightly presume an entire industry negligent," *In re City of New York*, 522 F.3d 279, 285 (2d Cir. 2008),

---

[21]     Neither Miguel nor MetLife has put forth any evidence of the relevant industry standard of care. The only evidence even tangentially related to this point was an affidavit that Miguel submitted from a forensic document examiner, John Paul Osborn.  *See* Osborn Aff. (ECF No. 61, Ex. A).  Osborn opined that in his professional opinion, the "acceptance of signed faxed documents of vital significance and in lieu of an original, by banks, insurance companies and corporate entities, constitutes an unconscionable business practice that exposes customers and companies alike to considerable risk of fraud and deception.  I believe such practices should be forbidden by law."  Osborn Aff. ¶ 5.  But Osborn's opinion about how the industry *should* conduct itself is a mere recommendation from someone outside the industry, which does not establish the standard of care that actually prevails in the industry.  *See Diaz v. N.Y. Downtown Hosp.*, 287 A.D.2d 357, 359 (N.Y. App. Div. 2001) ("Although noncompliance with such a customary practice or industry standard may be evidence of negligence, the failure to abide by guidelines or recommendations that are not generally-accepted standards in an industry will not suffice to raise an issue of fact as to a defendant's negligence." (internal citations omitted)).  Counsel for Miguel represented to the court at oral argument that "as far as we can tell at this point, there are no standards in the industry for handling these withdrawal requests."  Trans. at 17.

there are times when "a whole calling may have unduly lagged in the adoption of" prudent

procedures. *The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir. 1932). As Learned Hand famously

explained, "[t]here are precautions so imperative that even their universal disregard will not

excuse their omission." *Id.* In such cases, the jury must determine for itself "the competence

which a reasonable man in the position of the actor would recognize as necessary to prevent it

from creating an unreasonable risk of harm to another[.]" *Landon*, 91 A.D.3d at 84 (quoting

Restatement (Second) of Torts § 299 (1965)).

   In support of his claim that MetLife acted negligently, Miguel points out that

"MetLife took no precautions at all" "to verify that withdrawal requests it received were

genuine." Mem. of Law in Support of Miguel D. Moreno's Opp. to MetLife's Mo. for Summ.

Judg. (ECF No. 61-7) ("Miguel Mem.") at 16. "Any withdrawal document faxed to them

resulted in a disbursement of funds from the annuity. Neither the signature, nor the identity of

the requestor was checked despite the fact that signatures were maintained in electronic format."

*Id.* "Thus," Miguel argues, "it is clear that MetLife breached its duty of care to [Miguel] by

failing to take minimal steps to verify the veracity of the withdrawal requests it received." *Id.*;

*see also id.* at 18 ("As Mr. Osborn points out, signatures on faxed documents are easily forged or

manipulated by electronic means. . . . [A]nyone with a computer could 'cut and paste'

[Miguel]'s signature from one document onto a MetLife withdrawal form. . . . Thus, MetLife's

procedures for disbursing variable annuity [sic] provided no protection to its customers at all.").

   I find that the evidence is sufficient for a reasonable factfinder to conclude that

MetLife's processing of Lucy's withdrawal requests fell below a reasonable standard of care that

MetLife owed to Miguel, and that this breach proximately caused Miguel to lose the value of his

annuity. Although MetLife had exemplars of Miguel's signature on file, MetLife admittedly did

not even attempt to compare the signatures on the withdrawal request forms with these
exemplars.  This cavalier procedure clearly falls below the industry standard of care in the
related field of banking.  *See, e.g.*, *Novak*, 30 N.Y.2d at 142 (holding that absent other suspicious
factors, a bank may generally discharge its duty of reasonable care "if its employees have
compared the signature on the withdrawal slip with the one in their records and found that the
difference, if any, was not marked or apparent"); *Kelley*, 180 N.Y. at 181 ("It is possible that
there may be special cases in which it may not be necessary for bank officers to make a physical
comparison between one signature on file with a bank and another upon a draft or check
presented to it for payment, but if so, there must exist some unusual and pertinent excuse . . .
tending to show that the failure to make such a comparison is not at variance with the
requirements of ordinary care."); *Appleby*, 62 N.Y. at 18 ("[I]f the two signatures were so
dissimilar as when compared the discrepancy would be easily and readily discovered by a person
competent for the position, then the failure to discover it would be evidence of negligence . . .
."); *Travelers Indem. Co. v. Scalea*, No. 85 CIV. 0400 (WK), 1987 WL 27737, at *3 (S.D.N.Y.
Dec. 4, 1987) ("A bank is responsible to compare a check's signature with the customer's
signature card.").  Although the banking standard of care is not directly applicable to this case, it
is nonetheless probative of the standard of care generally expected of financial institutions
entrusted with processing withdrawal requests from customers' money.  *Cf. Commisso v. Nat'l
City Bank of New York*, 21 N.Y.S.2d 187, 191 (Sup. Ct. 1939) (considering whether "the rule as
to the responsibility of savings banks for payments made upon forged drafts applies in the case
of an account in a commercial bank," and holding that commercial bank "was obligated to use
not alone due care and diligence but active vigilance in paying out the plaintiff's moneys, in

29

order that he might be protected from fraud, larceny and forgery"), *aff'd*, 259 A.D. 891 (N.Y.

App. Div. 1940), *lv. denied*, 259 A.D. 1028, 1029 (N.Y. App. Div. 1940).

   Moreover, MetLife failed to impose other simple procedural safeguards against

fraudulent withdrawals.  For example, MetLife's withdrawal request form expressly invites the

requestor to specify a payee or mailing address *different* from the account owner and address on

file.[22]  Thus, MetLife readily issues checks drawn on its customers' accounts to payees other

than the record owner, mailed to addresses other than the record address, in amounts for

hundreds of thousands of dollars, without even a simple comparison of the signature on the

withdrawal request to the signature on file.[23]  A reasonable juror could conclude that this practice

is so lax, and the risk and gravity of harm from fraudulent withdrawals is so obvious and great,

that a reasonably prudent financial institution is obligated to do more to safeguard its customers'

investments from fraudulent depletion.[24]

---

[22]  The withdrawal form expressly invites the requestor to specify an "[a]lternate [p]ayee or [a]ddress" on the form if the "withdrawals are to be paid to other than Owner and/or mailed to an address other than address of record." ML0075. When the court inquired at oral argument about this option of specifying an alternate address, MetLife's counsel responded "I don't think that there is [such an option], Your Honor. . . . What I think the procedure is, is that the request for the withdrawal's received, the check is written to the owners of the account and then it is sent to the address of record – no matter what may be in a cover letter or may be on any form." Trans. at 28. When the court asked whether counsel's belief was supported by the record, she responded that she would find the record citation later and follow up with a letter to the court, stating "we'll find that for you, but I think that the testimony will show that, notwithstanding whatever was written on this withdrawal request form, that it was mailed to the address of record.  That's one of the safeguards." *Id.* at 29.
  After oral argument, the court ordered MetLife to produce documents evidencing the address to which each check was sent, and the address of record on the Account at the time of each check.  It is evident from MetLife's supplemental submission that the September 2006 check was sent to Lucy's address in Flushing, New York, in accordance with the withdrawal request, while the address of record on the Account at that time was in Santo Domingo in the Dominican Republic.  *See* ML0074-75 (9/15/06 Withdrawal Req., Kaufman Dec., Ex. D, ECF No. 56); ML0104 (9/15/06 Partial Surrender Transaction Data, ECF No. 73-6); ML0141 (MetLife Quarterly Stmt. 6/30/06-9/30/06, ECF No. 73-7).  Thus, not only do MetLife's standard procedures clearly authorize checks to be sent to unknown addresses; that's exactly what MetLife did in this case.
[23]  Even counsel for MetLife acknowledged that permitting checks to be mailed to addresses other than the record address was an invitation for fraud; however, confused about the record, she inadvertently argued it in the reverse, saying that "[t]he safeguard [here] is that [the] check is sent to the address of record.  It wouldn't be sent to the federal penitentiary . . . ." Trans. at 27.
[24]  The only other procedural "safeguard" against fraud that MetLife identified was its practice of making the check payable to both owners on the account.  *See* Trans. at 28 ("Just one other safeguard.  The check then is made payable to the two owners of the account."); *see also* MetLife Mem. at 10 ("[MetLife] would only make payment jointly – e.g., a check drawn pursuant to a withdrawal request would list as payee both the contract

Furthermore, even if MetLife's procedures governing withdrawals did not violate a duty of care in the absence of any particular indicia of suspicion, here there were red flags that should have triggered in MetLife a more robust effort to guard against fraudulent or unauthorized withdrawals.  As discussed above, MetLife received a letter from Lucy in November 2005 – *before* the disputed withdrawals – instructing MetLife that she "d[id]n't want any withdrawal from the account," unless she agreed that $150,000 would go to her account and the rest could go to an account of Miguel's.  *See* ML0081.  The letter provided a new address for Lucy, in Flushing, New York, and instructed MetLife that she wanted to begin receiving copies of the Account's statements "every month in my house in [F]lushing."  *Id.*  She concluded by warning MetLife that if it took any actions on the Account without her prior permission, MetLife would be responsible.  *Id.*

This letter conveyed a host of information to MetLife.  It made clear that Lucy was somewhat uneducated and unsophisticated; the letter is littered with typos, misspellings, and unclear phrasing.  Further, the letter revealed that Lucy and Miguel had separated.  Lucy expressly provided a new address to MetLife that she referred to as "my address," and which was different from the address that MetLife had on file for the Account at that time.  Notably, MetLife did not change the address of record on the Account in response to this letter, indicating that it did not simply view the letter as a joint change of address request on behalf of Lucy and Miguel together.  In addition to this physical separation, the letter also revealed a personal separation between Lucy and Miguel, by making it evident that they were no longer acting

---

owner and the joint owner.").  But this is surely an anemic safeguard against fraudulent withdrawals; at most it simply necessitates a second forgery – a forged endorsement to deposit the check.  *Cf. Am. Lodge*, 100 A.D.2d at 285-86 ("[T]he mere placement of the depositor's name on the check representing the funds withdrawn is of no significance to the depositor if in fact a forger received the check and was able to obtain the funds represented by the check by way of a second forged indorsement. . . .  The Legislature has determined that it is the bank that bears the burden of loss where payment is made on a forged signature . . . .").

cooperatively as joint owners of the Account.  Lucy clearly instructed that she wanted to receive her own copies of the monthly statements.  And, most importantly, Lucy specifically cautioned MetLife against making withdrawals from the Account, and forbade it from making any that were payable to a single payee at a single address: She stated very clearly that no withdrawals whatsoever should be made from the Account unless the money was divided, with a portion of the money going to her and a portion to Miguel.

Even if a jury concluded that MetLife's withdrawal procedures were adequate in the abstract, it could nevertheless find that MetLife should have recognized these pieces of information as red flags necessitating more vigilant procedures surrounding its processing of withdrawals from the Morenos' Account.  Indeed, the letter gave MetLife *specific instructions* to scrutinize any requests for withdrawals from the Account with special care and not to honor any withdrawal requests without making separate payments to Lucy and Miguel respectively.

Again, the banking context provides a useful analogy.  The New York Court of Appeals has held that if there is nothing about a withdrawal transaction that would arouse suspicion, then "in the usual case the [savings] bank will be exonerated if its employees have compared the signature on the withdrawal slip with the one in their records and found that the difference, if any, was not marked or apparent."  *Novak*, 30 N.Y.2d at 142.  However, "[a] manifestly different situation is presented" where the withdrawal transaction was accompanied by other suspicious factors, such as that "the passbook was presented soon after the bank opened on a Monday morning and that a cash withdrawal of $12,000 out of a balance of $12,700 was demanded by the person presenting the passbook."  *Id.*  Where such red flags are present, it is "a jury question . . . whether, under all the circumstances, a mere checking of signatures satisfied respondent's obligation to exercise due care," or whether "additional inquiry" was required to

32

verify the person's identity even "if the tellers were satisfied with the authenticity of the signatures." *Id.* at 143. Thus, the bank "was required to prove to the satisfaction of the jury that the circumstances surrounding the withdrawal transaction were such as would not arouse the suspicion of its employees. 'If at the time a fact or circumstance was brought to the knowledge of the defendant's officers [or other employees] which was calculated to and ought to have excited the suspicion and inquiry of an ordinarily careful person, it was clearly their duty to institute such inquiry, and their failure to do so presented a question for the consideration of the jury.'" *Id.* at 142 (quoting *Gearns*, 135 N.Y. at 562 (alteration in original)); *see also Noah*, 225 N.Y. at 288 ("There is no rule of law . . . which makes the asking of . . . specific questions and the examination of the signature a complete defense as a matter of law in all cases. Circumstances might require other things to be done to establish care and diligence. . . . [T]he bank cannot rely in making payment solely upon the possession and presentation of the bank book . . . , but must exercise ordinary care and diligence to ascertain that the person receiving the money is entitled to it." (citing *Kelley*, 180 N.Y. 171)); *Appleby*, 62 N.Y. at 18 ("If . . . a fact or circumstance is brought to the knowledge of the officers, which is calculated to, and ought to excite the suspicion and inquiry of an ordinarily careful person, it is clearly the duty of the officers to institute such inquiry, and a failure to do so is negligence for which the bank would be liable . . . . The officers of these institutions are held to the exercise of reasonable care and diligence."); *Renzi*, 44 A.D.2d at 649 ("[T]he bank had a duty to exercise care and diligence to determine if the party requesting the withdrawal had a right to receive the requested funds. Where some fact or circumstance ought to 'have excited the suspicion and inquiry of a[n] ordinarily careful person,' the bank has a duty to inquire into the circumstances before it pays out the funds." (quoting, *inter alia*, *Novak*, 30 N.Y.2d at 142)).

33

This case law suggests that MetLife was obligated, at minimum, to visually compare the signatures on the withdrawal slips to the signatures in its records.[25]  In addition, numerous factors surrounding the withdrawal requests should have excited MetLife's suspicion and triggered greater inquiry, including: (1) MetLife's receipt of Lucy's letter, informing MetLife of her apparent split from Miguel and prohibiting withdrawals from the Account unless they were divided and made payable to her and Miguel separately; (2) that the September 2006 withdrawal slip requested that the check be mailed to an address different than the address on file for the Account; (3) that the withdrawal requests were for enormous sums of money, entirely emptying the Account; and (4) that the withdrawal requests were sent by fax, which makes forgery methods like photocopying and tracing harder to detect.  Accordingly, the withdrawal requests in this case raised red flags that may have induced a reasonable MetLife employee to take further action to protect against fraudulent withdrawals beyond simply comparing the signatures.

CONCLUSION

Because a rational jury could render verdicts in favor of Miguel on his third-party claims against MetLife, MetLife's motion for summary judgment is denied in its entirety. Miguel's third-party complaint is hereby deemed amended to include a breach of contract claim, in addition to his claim for negligence, and questions of fact necessitate a trial of both claims.  As explained above, my conclusion that MetLife owed Miguel a duty of care independent of its contractual obligations is without prejudice to further briefing on the issue should the jury render

---

[25]     The court has examined the two withdrawal slips bearing the allegedly forged signatures, as well as various samples of Miguel's authentic signature, including the very signatures that MetLife maintained on file in connection with the Morenos' Account.  *Compare* ML0082 (Kaufman Dec., Ex. G, ECF No. 56) and ML0075 (Kaufman Dec., Ex. D, ECF No. 56), *with* Osborn Report (ECF No. 67) and Data Collection Form (ECF No. 70, Ex. A).  Although the court does not find that the difference between the allegedly forged signatures and the authentic signatures is markedly apparent, MetLife may nonetheless have been obligated to do more than merely visually compare the signatures before honoring the withdrawal requests.

a verdict in favor of Miguel on the tort claim only.  Jury selection and trial will occur on

September 24, 2012, at 9:30 A.M.

So ordered.


John Gleeson, U.S.D.J.

Dated: August 31, 2012
      Brooklyn, New York